Good morning, Your Honors. Good morning, Mr. Summermeyer. May it please the Court, I recognize the presence of my client, Kristen Naca, and her spouse, Alaina Favella, in the courtroom, and I also recognize the presence of Macalester's incumbent provost, Corinne Moe. After Macalester's brief factual disputes remain that would enable a jury to find for Professor Naca on her failure to accommodate reasonably the chronic valley fever pain and fatigue claim and her sexual orientation discriminatory discharge claims. She pleaded the joint efforts of Provost Murray and Moe, who engineered and executed her discharge, exploited stereotypes, voiced baseless fears of parents' litigation, and speculated future lawsuits, disregarded neutral fact findings. She argued the point to the district court. She uncovered the smoking gun of 24 June 2015 and argued its significance in the principal brief. We point out that the Omichono case from Wisconsin survived Rule 12 without explicitly pleading cat's paw, and we point out that the Seminole-Proctor case that reached the Supreme Court didn't have the phrase cat's paw in its pleading, so that succeeded. And so she states a disability discriminatory discharge claim. As to the FMLA amendment denial, Macalester punted. Proof that Naca's actions didn't add up to comprise sexual harassment or sexual assault on its own existing written policies that the adult alumna admitted to Macalester's impartial investigators she pursued, her former teacher for a post-graduation relationship, and that Macalester made ever-changing reasons for a discharge, met silence from Macalester. Now Macalester's pretextual abuse of the now discredited 2011 Dear Colleague letter requires trial on the sex discrimination claim. The court should reverse, remand for trial these claims. Can address the failure to accommodate reasonably claim, I'll ask your honors to consider the comparison and contrast of structured versus unstructured time. We start with a few simple propositions that the ADA and Section 504 congruently hold employers accountable. In comparison with the average person, 504 and the ADA and the Minnesota Human Rights Act require reasonable accommodation of disability induced pain. Cited a number of cases, Molina. What's the failure to accommodate? Here it goes, your honor. First, as to structured time, Macalester admitted that it failed to accommodate Professor Naca's request for accommodation of structured time, specifically class time. Macalester failed to... When you say class time, you mean how much time in class or when the classes occurred? When the classes occurred, classes themselves, and yeah, just class time. That was the structured time. Unstructured time, by contrast, office hours, correcting papers, meeting students, fulfilling mandatory obligations for meetings... So what did she request that was denied? Thank you. Okay. She requested hours off in the afternoons through her Dr. Vicoda, and that's record 1177 and 1813. She requested days off during the week. That's record 1964, paragraph A. Now, refuting... Were these supported by doctor's statements? Yes. You're aware of the law? Yes, they are. Did your client admit that she could perform the jobs with the accommodation that was given? Your Honor, she performed the essential functions in pain. She was seeking accommodation for the pain that she had to endure. She sought time off, rescheduling, which that's a potential accommodation under the ADA, and it's a statutory right under the FMLA, and the courts are clear, look at them both. An FMLA right to unpaid leave up to 12 weeks, including intermittent leave, is a statutory right, and as that Riley case that we cited says, look at the exercise of that right and see whether it's posing an undue hardship. Was there a specific request for FMLA leave? Absolutely. There were... Professor Naka pleaded numerous times in her amended complaint, which was verified. She pleaded a request for medical leave. McAllister denied her leave. Finally, when she requested leave in 2013, she was threatened with her job by Employment Services Director Graf. Then Provost Murray ratified that. Leave sought for the denials of those prior to termination? Yes. Yes, they were. In 2014, she requested leave again. McAllister engaged in an ambivalent wishy-washy discussion. We can give you three courses in the fall, two in the spring... I thought it was two. I thought it was two courses in the fall, counsel. Two in the fall, three in the spring, and we can flip you to... Well, that really isn't an accommodation. I thought even in the spring, they said they'd do two at that time as well. I thought that was the bottom line. There was no course release. She'd be doing five courses throughout the academic year. I thought by her deposition, she said that two in the fall, two in the spring if needed. It would be two versus three or three versus two. That was the problem. So there was no real accommodation. Then we roll around to 2015. She requested leave in a 13 March 2015 email. Now McAllister was denying that she'd ever asked for any leave. Well, finally, they admitted that she did. But the problem was that the provost had misled, had stated falsely, and the incumbent provost attempted to cover up for her. So what happened when she finally, when she asked for leave in 2015, and directly contradicting Murray's own testimony, her own log at record 1980 shows that she walked with the English department chair, English, down to the finance employee, Lynn Hertz, and said, here she is, get the coverage for Professor Naka's course in the fall semester so she can have this course release. Well McAllister fired her before she could enjoy that course released. What was obscured? First of all, Provost Moe asserted that Professor Graff, after Provost Murray had denied her request for leave in 2012. Well, there's a real problem with that. Because even McAllister admitted, even through his venerable attorney, that the first time that Naka ever met Graff was 2013. And that, right, that's in record 1183 and 1115. And that was part of the, 1115 is Professor Naka's deposition. There's questions, you know, from McAllister's counsel saying the first time that she met her, met Graff was 2013, not 2012, as Moe, the 30B6 witness, binding McAllister, testified that she had followed up in 2012. Counsel, what proof is there in the record to indicate that the eventual termination was not connected directly with behaviors that the institution found unacceptable, as opposed to some retaliation for the various employment claims? Well, let's, okay, Your Honor, let's address the sexual orientation. If the state, excuse me, if the institution had a legitimate basis for its termination other than the allegations of discrimination, the termination might withstand legal challenge. Thank you, Your Honor. I'll address the points we made in the sexual orientation discharge claim and the sex discrimination discharge claim. First, McAllister conducted a factual investigation through his McAllister College harassment committee. Factual, no judgment, following prescribed regulations. They found, first, there was no coercion, no pressure upon the student. Second, they found that the meeting took place on the 7th of May, which was after classes were in, grades were in. There was no discussion about work before that. They found that the student, Doe, had pursued Professor Naka after graduation and that their relationship commenced after graduation. They found that the student publicized their relationship and that the professor ended it, even after the student had become an employee and attempted to pursue it. They also found that, I don't know, I think I... You're within your rebuttal. I know, I've got to, okay, I'll sum this up really quickly, Judge. Okay, so they found, factually, MCHC found nothing. There was an administrative quagmire denying her due process rights. The House Council and the student dean were both the Title IX investigators and even the 2011 letter said, you don't do that. And then you had the decision makers who ultimately decided were tainted. The president was involved with communicating with the parents and with Doe herself. That was concealed from Naka. This is in derogation of Title IX regs and just common sense and due process to make sure she had all the evidence available to her. What she did, according to MCHC, did not add up to sexual harassment, did not add up to sexual assault. The college skirted the fact that the student stated plainly, they never alleged sexual assault, but they tried to bring that in. And then when it comes to pretext, you find Moe talking about a hypothetical of a professor meeting an alum many years later and maybe that wouldn't be so bad. Well, they're touting exactly that same reality, that there was a Professor Sears and an alumna, Ms. Michael Bust, who worked together. They had their enterprises grew and grew and then they ultimately got married. Well, the only difference between that relationship and the Naka relationship was the sex of the parties. And then you have the email from Murray to Ostroff saying both of them are equally stupid. Now, you don't refer to a purported victim as stupid. And holding them equally, that what are they equal for? Equal, they're the same sex. That puts those questions before the jury. I'm going to reserve the rest of my time for rebuttal. I've cut into it a lot. But I just want to say it a little. Thank you, Mr. Nicklaus. And the last, your honor, the last name is Nikita, it's like the shoe pounder from Russia. Thank you. Mr. Sommermeyer. Good morning. May it please the court. I'd like to use my time today in the way that the court would deem most helpful. So if the court has issues or questions at the outset, I can address those. Otherwise, I think my time would best be spent walking through the various rulings that appellant challenges here and highlighting the easiest way to affirm. This is a straightforward case. There is no error of law. The legal issues are well settled. And none of the material facts are in dispute. Appellant raises five issues. The Rule 12 dismissal of her disability discrimination claims, denial of her motion to amend, and the Rule 56 dismissal of her claims for discrimination on the basis of sex, sexual orientation, and failure to accommodate disability. On the first issue, appellant commenced this lawsuit with what can only be described as a kitchen sink complaint. It consisted of 35 causes of action, many of which were clearly a time barred or did not exist under applicable law. McAllister moved to dismiss the complaint in its entirety. And the district court dismissed roughly two-thirds of those claims under Rule 12B6. Of the claims dismissed at the Rule 12 stage, appellant challenges only the dismissal of her claim for discriminatory discharge on the basis of disability. As the district court found, the disability discrimination claims in particular were properly dismissed because appellant failed to plead any disability-based animus by the actual decision makers in the case. And she did not allege any non-disabled comparators that were treated more favorably. On appeal, appellant has shifted to a theory that she neither pled nor argued below, and that is the cat's paw theory that you heard about from Mr. Nikitas. The theory is essentially that the former provost, who dealt with appellant's various claims for disability accommodations, somehow used the new provost, the faculty committee, and everyone else who was involved in the decision to terminate appellant as a cat's paw for disability discrimination. The easiest way to dispose of this here is to find correctly that the argument has been waived because it was not argued below. In addition, nowhere in the complaint are there any facts to support this theory. Appellant did not plead anything that would suggest that the actual decision makers in the case acted as a vehicle for the former provost to carry out disability discrimination. The second issue is the district court's denial of appellant's motion to amend. In order to make this issue for appeal, appellant was required to timely object to the magistrate judge's order under Rule 72. Appellant filed an over-length brief, nearly double the word limit the date that her objection was due. The district court struck that objection. She then sought leave to refile, which the district court denied. Nothing in appellant's brief provides any basis for overturning the district court's decision, and we would ask that this court affirm. Even if the court were to consider the motion to amend on the merits, as Judge Schiltz noted in his order denying leave to refile the objection, the proposed amendment was futile because the claims appellant sought to assert were time-barred. Next, I'll turn to the district court's summary judgment order. Of the eight claims on which the district court granted summary judgment, appellant appeals only three, discriminatory discharge because of sex, discriminatory discharge because of sexual orientation, and failure to accommodate disability. Now, as this court's aware, the district court issued a thorough 55-page order on summary judgment. Not only did the court accept appellant's version of the facts as true, as it noted in its order, it spent dozens of hours of its time scouring the record to locate all of the evidence that might support appellant's claims, and it found none. First, as to the discrimination claims, the court found there was no evidence, there was no direct evidence of discrimination. The court also found that there was no prima facie case. As it noted, there's no dispute in this case that appellant's career was progressing smoothly at Macalester, and both she testified and the decision-makers at Macalester testified that she was a strong candidate to earn tenure. What changed in 2015 was not appellant's sex or sexual orientation. What changed was that a student came forward with a complaint that appellant had improperly engaged in a sexual relationship with her. But even if appellant had established a prima facie case, there is no evidence from which a fact finder could conclude that Macalester's reasons for discharging appellant was pretext for discrimination. And the district court carefully addressed the arguments on summary judgment, including the arguments that appellant makes today. Appellant claimed a few things. One was that there were comparators who were treated differently. The district court found that appellant did not meet her high burden to show that those comparators were similarly a professor against whom students raise complaints of inappropriate comments in class. That individual was, that complaint was heard by Macalester 13 years prior to when appellant's case was heard. It involved none of the same decision-makers. And as the district court found, the conduct at issue in that complaint was, quote, worlds apart from appellant's sexual relationship with a student. In all, the district court found zero evidence of pretext in that situation. You heard from Mr. Nikitas today about Professor Sears. That is even weaker than the comparator I just discussed. That individual is a current professor at Macalester. The record evidence shows that sometime after a student in his class graduated, they got married six to seven years after she had been in his class. No complaint was brought to Macalester about Professor Sears' conduct. There were no comparable decision-makers because there was no decision in Professor Sears' case. Now you heard a lot from Mr. Nikitas and there are claims in his brief that there are various issues that Macalester had that culminated in her discharge. There is no dispute that this case was thoroughly reviewed. There were five layers of decision-making at Macalester. The case went before a harassment committee. That decision reads much differently than Mr. Nikitas described it to you. What the harassment committee said was that the case should proceed to a formal resolution before the provost and that's where it went. And from there, the provost issued a recommendation that appellant should be discharged. That recommendation was then heard by a committee of her faculty peers who endorsed recommended termination. Appellant then had an additional opportunity to appeal. The appeal resulted in affirmance of the discharge. Now as the district court found, whatever issues she has sought to raise with respect to the process, she has no evidence that connects any of those supposed infirmities with the process to invidious discrimination. And this court has said numerous times that a mistaken decision or a bad decision is not evidence of discrimination unless there is some evidence of discriminatory animus on the part of the decision-makers. And here, there is none. Finally on appellant's failure to accommodate, there is no dispute that Macalester provided appellant with various accommodations throughout her employment. Appellant testified in her deposition and her attorney acknowledged today that she was able to and did perform all the required tasks of a Macalester faculty member. Under Burkett. Essential functions is what she says in her deposition, right? The central functions, I believe that's correct. Central or essential? Essential. Essential, that's what I thought. Go ahead. Now, under Burkett, which I would argue is an all for his case here, this court held that an employee has no right to accommodations beyond those that are required for her to do her job. And so that testimony from appellant is fatal to that claim. Unless the court has questions, that's all I have. I see none. Thank you, Mr. Somermeyer. Thank you. Mr. Nikitas, your rebuttal. It's still Nikitas, Your Honor, but I won't bring my shoe this time. I'm sorry. When it came to the, let me raise a couple points. Going from the MCHC to the disposition by the FPC, first of all, there was no choice in what happened. If the complainant wanted to go to formal resolution, it did. Although the MCHC and writer Chas Topaz found the facts don't add up to sexual harassment, they don't add up to sexual assault. Let's not change the policy in midstream and I won't sign off on anything that does so for this case. And the incumbent, Provost Murray, admitted to the FPC Chair Ostroff, the policy is weak as far as relationships between faculty and alumni. And when it comes to the explanations that the FPC and Moe made, there was no factual basis for this made-up relationship between We have these ever-changing explanations. We go from the policy, we go to, well, she could make people vulnerable because she teaches poetry or she set the stage. Well, this court in the Amir case found these ever-changing explanations to be reversibly suspicious to justify firing Professor Amir. We've got the same thing right here with Professor Naka. And when it comes to accommodations, you don't have to force a worker to work in pain. It may be cheaper for the employer to make a worker, especially somebody wanting tenure, to work in pain, but she posited reasonable accommodations, her doctor helped her out, and McAllister wasn't going to acknowledge that she had these rights nor would they spend the money to find out exactly how she could be accommodated or what the extent was of her pain. This case should be reversed and remanded for trial on the claims that we've identified. Thank you, Your Honor.